UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUBEN J. RUIZ,

    Plaintiff,

    v.

EVERETT W. FISCHER; et al.,

    Defendants.

No. C 07-326 MHP

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this pro se prisoner's civil rights action, Ruben Ruiz alleged due process violations during the proceedings that led to his placement in administrative segregation in 2000 as a result of being validated as a prison gang associate. The court has resolved several of the claims in this action through earlier orders, and the only part remaining for adjudication is Ruiz's claim that the evidence used to validate him was insufficient and unreliable. Defendant Harrison now moves for summary judgment on that claim. For the reasons discussed below, the court grants the motion. Judgment will now be entered in favor of all defendants.

## BACKGROUND

In this action, Ruiz complained about the decision to place him in administrative segregation on an indefinite basis based on a determination that he was a validated associate of a prison gang. The court earlier dismissed claims against defendants Hawkes and Fischer as unexhausted. See Order Of Partial Dismissal And Setting Briefing Schedule, p. 9. The court also dismissed as barred by res judicata Ruiz's claim that his right to due process was violated because he was not given notice and an opportunity to be heard. See Order Granting

In Part Motion For Summary Judgment, pp. 12-15.  As a result of these earlier rulings, the only claim remaining for adjudication concerns the evidence relied upon to validate Ruiz as a prison gang associate.  This order thus focuses on the facts and law relevant to that limited inquiry.

The following facts are undisputed unless otherwise noted.

Ruiz is a California prisoner serving a sentence of life imprisonment without the possibility of parole for first degree murder.  Harrison is a special agent working the office of correctional safety's special services unit within the California Department of Corrections and Rehabilitation.  (The office of correctional safety was formerly known as the law enforcement and investigations unit ("LEIU").)

A gang validation/rejection review form was prepared for Ruiz and signed by John Harrison as the reviewer.  Complaint, Ex. B, p. 46.  This form, dated December 22, 2000, stated that a gang validation package was received with five source materials, and that the five items described below – viz., the two CDC-128bs dated November 13, 2000, the September 8, 1998 debriefing memorandum, the May 22, 1995 confidential memorandum and the April 11, 1995 confidential memorandum – met the requirements for validating the inmate as a gang affiliate.  The form stated that, pursuant to the validation requirements in 15 Cal. Code Regs. § 3378, Ruiz was validated as an associate of the Mexican Mafia (EME) prison gang.

Harrison relied on the following five items when he determined that Ruiz met the criteria for validation as a gang associate:

(1) A CDC-128b (i.e., prison parlance for a memorandum) dated November 13, 2000, written by sergeant Clement.  The CDC-128b stated that, during a search of Ruiz's cell on November 8, 2000, Clement discovered three personal address books, one of which contained the name and address of Freddy Torres, a validated Mexican Mafia associate.

Harrison considered the information reliable because possession of another validated prison gang's address was evidence of association that could be used for validation under 15 Cal. Code Regs. § 3378(c)(8)(G).  He further explained: "Inmates associated with a prison

2

1  gang often retain the personal address of other affiliates to maintain contact with these

2  individuals.  Because gang members are often paroled, discharged, or transferred to other

3  prisons, prison gang members often communicate with each other to plan assaults or other

4  criminal activities through writing." Harrison Decl., ¶ 9(b).

5    (2) A second CDC-128b dated November 13, 2000, written by sergeant

6  Clement, along with a drawing.  The CDC-128b described the drawing that he found in a

7  search of Ruiz's personal property on November 8, 2000:

> During this search I discovered a drawing which contained numerical and phonetic symbols indicative to and consistent with those used by the Mexican Mafia.  One (1) is a Aztec Sun Stone where the central face depicting the frontal view of Tlaltecuhtli (Earth's face) has been altered, the headdress or crow has been removed and been replaced with three (3) circular dots over two (2) horizontal lines depicting the Aztec numeral Thirteen (13).  Which is the encryption used by the Mexican Mafia to denote the thirteenth letter of the English language, the letter "M" which stand for Mexican Mafia.  The second is the actual letter "M", which appears twice, standing alone, used as a symbol instead of a part of a word or a spelling.  This double "M" (MM) is a known abbreviation or symbol meaning Mexican Mafia.  This drawing will be used as written material, as one (1) of three (3) points to validate Ruiz, H-67621 as a Mexican Mafia associate.

Complaint, Ex. A, p. 41 (errors in source).  The letter "M" is not readily visible but the number "13" is prominent in the drawing.

  Harrison explained that symbols which are used by and considered distinctive to a prison gang are considered reliable pieces of evidence that could be used to support gang validation.  See 15 Cal. Code Regs. § 3378(c)(8)(B).  He further explained that the symbol was a Mayan, rather than an Aztec, symbol that represented the number "13." This corresponded with the thirteenth letter in the alphabet – the letter "M" -- and is a symbol associated with and used by the Mexican Mafia.  He also stated that it was his understanding, based on his training and experience, "that only gang members are allowed to possess the symbols of the gang without suffering serious repercussions for possessing such symbols, including death." Harrison Decl., ¶ 8(a).

  (3) A confidential memorandum dated April 11, 1995 that described information provided by a Mexican Mafia associate that involved a communication with non-incarcerated Mexican Mafia gang members and directly implicated Ruiz in gang activity.

3

Harrison described in the sealed portion of his declaration the reasons he considered this information reliable.   The declaration also explained how the information in the memorandum showed Ruiz's direct involvement in Mexican Mafia gang activities.

(4) A confidential memorandum dated May 22, 1995 that stated that another Mexican Mafia associate identified Ruiz as a "soldier" in the Mexican Mafia.

Harrison explained that this information was considered reliable because the informant satisfied the CDCR's reliability criteria.  The informant had incriminated himself by providing detailed accounts of Mexican Mafia related activities in which he participated and because some of the information was proven true through subsequent investigation.

The May 22, 1995 memorandum is no longer useable as a source item, per the settlement agreement in Castillo v. Terhune, No. C 94-2874 (N. D. Cal. 1994), which provided that an item cannot be used unless the informant referred to specific gang-related acts performed by the identified inmate.  The changes required by the Castillo settlement were applied on a prospective basis effective September 23, 2004.  That is, they were not in place until several years after Harrison considered the evidence for Ruiz's validation.   The validation regulations were changed significantly.  See Complaint, Ex. I.

(5) A confidential debriefing report dated September 8, 1998 that mentioned that Ruiz had ties with the Mexican Mafia.  This report described the same gang-related incident involving Ruiz that was mentioned in the April 11, 1995 memorandum.

Harrison explained that this information corroborated the information from the same informant in the April 11, 1995 memorandum.

This September 8, 1998 debriefing report was later determined not to be appropriate as a separate source item because it duplicated the information in the April 11, 1995 confidential memorandum.

During the validation procedures, Ruiz was allowed to see the first two items (i.e., the November 13, 2000 CDC-128b with the attached drawing, and the November 13, 2000 CDC-128b regarding the handwritten notation of Freddy Torrez's home address).  Ruiz was not allowed to see the last three items because they were deemed confidential.  For each of

4

those three items, Ruiz was given a CDC-1030 confidential information disclosure form dated January 26, 2001.

The CDC-1030 form that corresponded with the April 22, 1995 memorandum stated that the memorandum was written by D. M. Serrano and the information received indicated "that you have close ties with the EME (Mexican Mafia)." Complaint, Ex. A, p. 42. Boxes were checked on the CDC-1030 that the information was considered reliable because "[m]ore than one source independently provided the same information" and "[p]art of the information provided by the source(s) has already proven to be true." Id.

The CDC-1030 form that corresponded with the May 22, 1995 memorandum stated that it was a "confidential memorandum dated 5-22-95 authored by D. Serrano" and the information received indicated "that you are a soldier for the Mexican Mafia." Complaint, Ex. A, p. 43. Boxes were checked on the CDC-1030 that the information was considered reliable because "[t]his source incriminated himself/herself in a criminal activity at the time of providing the information," and "[p]art of the information provided by the source(s) has already proven to be true." Id.

The CDC-1030 that corresponded with the September 8, 1998 memorandum stated that it memorialized information obtained in a "debriefing interview dated Sept. 8, 1998" and that the information received indicated "you have been identified as an EME (Mexican Mafia) associate." Complaint, Ex. A., p. 44. Boxes were checked on the CDC-1030 that the information was considered reliable because "[t]his source has previously provided confidential information which has proven to be true," "[m]ore than one source independently provided the same information," and "[p]art of the information provided by the source(s) has already proven to be true." Id.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the claims occurred in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

5

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted). When there are cross-motions pending, the court looks at all the evidence submitted in support of, and in opposition to, both motions in ruling on each motion. See Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's complaint is not verified so it cannot be viewed as evidence in his favor.

The court's function on a summary judgment motion is not to make credibility

1  determinations or weigh conflicting evidence with respect to a disputed material fact.  See
2  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The
3  evidence must be viewed in the light most favorable to the nonmoving party, and the
4  inferences to be drawn from the facts must be viewed in a light most favorable to the
5  nonmoving party.  See id. at 631.

## DISCUSSION

A.    Due Process Claim

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law.  Changes in conditions of confinement for a prison inmate may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance.  Sandin v. Conner, 515 U.S. 472, 477-87 (1995).  The court assumes that Ruiz's placement in the SHU, which could result in a lifetime of extremely restrictive housing conditions, amounts to a deprivation of a liberty interest of real substance.  See generally Wilkinson v. Austin, 545 U.S. 209, 223 (2005).

When prison officials initially determine whether a prisoner is to be segregated for administrative reasons and a liberty interest of real substance is implicated, due process requires that they hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the charges against him or the reasons segregation is being considered, and allow the prisoner to present his views.  Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986).

Due process requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons.  See Superintendent v. Hill, 472 U.S. 445, 455 (1985); Toussaint, 801 F.2d at 1104-05.  This standard is met if there is "some evidence" from which the conclusion of the administrative tribunal could be deduced.  Superintendent v. Hill, 472 U.S. at 455; Toussaint, 801 F.2d at 1105.  The "some evidence" standard applies to an inmate's placement in SHU for gang affiliation.  See Bruce v. Ylst, 351 F.3d 1283, 1287-88 (9th Cir. 2003).  Ascertaining whether the standard is

7

satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence. See Toussaint, 801 F.2d at 1105. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached.

There is some authority for the proposition that the evidence relied upon to confine an inmate to the SHU for gang affiliation must have "some indicia of reliability" to satisfy due process requirements. See Madrid v. Gomez, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); see also Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990) (considering accuracy of polygraph results when used as evidence to support placement in administrative segregation); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987) (evidence relied upon by a prison disciplinary board must have "some indicia of reliability"). Assuming that the reliability requirement applies to an administrative segregation decision, if the information relied upon by the decision-maker is a statement of an unidentified informant, due process requires that the record contain some factual information from which the committee can reasonably conclude that the information was reliable and a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name. See Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987). Reliability may be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) in camera review of the documentation from which credibility was assessed. Id. at 186-87. "Proof that an informant previously supplied reliable information is sufficient." Id. at 187. Despite Ruiz's suggestion to the contrary, there is no requirement that every confidential statement used in a validation be independently corroborated.

Ruiz has not shown a triable issue of fact as to whether there was some evidence to support the decision to validate Ruiz. It is undisputed that five pieces of evidence were used by Harrison to conclude that Ruiz met the criteria for validation as an associate of the

8

Mexican Mafia prison gang.  The five pieces of evidence – individually and collectively – provided some evidence to support the validation decision.  Those five items provided evidence that: (1) Ruiz had in his possession the name and home address of a validated Mexican Mafia associate; (2) Ruiz had in his possession a drawing that contained Mexican Mafia gang symbols; (3) Ruiz was implicated in Mexican Mafia gang activity by a confidential informant in an April 11, 1995 memorandum; (4) Ruiz also was implicated in Mexican Mafia gang activity by the same informant in a 1998 debriefing report; and (5) Ruiz was identified by a different Mexican Mafia informant in May 1995 as being a soldier in the Mexican Mafia.  The third and fourth items covered the same information.  Ruiz's focus on item-counting, however, does not alter the due process analysis because it is a state regulation (not the federal due process right) that requires three separate items to validate an inmate.  See generally Bruce v. Ylst, 351 F.3d at 1288 ("The district court correctly noted that under the 'some evidence' standard, any of these three pieces of evidence would have sufficed to support the validation.")

     Ruiz also has failed to raise a triable issue of fact on the reliability of the evidence used by defendant Harrison.  On the evidence in the record, no reasonable jury could conclude that the evidence did not have sufficient indicia of reliability.  The court has reviewed in camera the three confidential memoranda, mindful that Ruiz will never be allowed to examine those materials himself.  The confidential memoranda meet the "some evidence" standard and have sufficient indicia of reliability.  See Harrison Decl., Ex. C at 2; Ex. D at 4-5; Ex. F at 8.  The confidential memoranda are constitutionally reliable, i.e., the memoranda contain some factual information from which the validating decision-maker reasonably could conclude that the information was reliable.  See Zimmerlee, 831 F.2d at 186-87.  The court also is satisfied that there is no safe alternative to in camera review.  The record before the court contains an affirmative statement that safety concerns prevent disclosure of the informants' names.  Even a redacted version of the memoranda could jeopardize people's safety because of the possibility that an inmate may be able to deduce from the memoranda who the informants were.  The two non-confidential items – i.e., the

9

two CDC-128Bs dated November 13, 2000 – fit within the CDCR's criteria for evidence of association that could be used for validation under the regulation which provided in 2000:

> The determination of a gang identification shall reference each independent source item in the inmate/parolee's central file. The sources shall be based on the following criteria: . . .
>
> (B) Tattoos and symbols. Body markings, hand signs, distinctive clothing, graffiti, etc., which have been identified by gang coordinators/investigators as begin (sic) used by and distinctive to specific gangs.
>
> (C) Written material. Any material or documents evidencing gang affiliation such as the membership or enemy lists, constitutions, organizational structures, codes, training material, etc., of specific gangs. . . .
>
> (G) Association. Information related to the inmate/parolee's association with validated gang affiliates.

15 Cal. Code Regs. § 3378(c)(8)(B), (C), (G) (2000 version).

Ruiz offers alternative interpretations of the evidence, e.g., that he had the gang associate's address for car-pooling purposes and had the drawing for something other than a *prison* gang purpose. His alternative interpretations do not help him. This court does not decide anew whether to validate him, but only whether there was some evidence with sufficient indicia of reliability to support the decision reached by the defendant.

Ruiz also argues that the documents used to validate him as a gang member or associate must show that he was engaged in or directed criminal acts. He is wrong on the law: a document need not show that the inmate engaged in or directed actual criminal activity for that document to be used to validate an inmate as a gang member or associate. Although evidence of criminal activity may be used to validate an inmate, it is not the only kind of evidence that may be used. See 15 Cal. Code Regs. § 3000 ("gang" defined), § 3378(c) (gang involvement investigation and sources).

Ruiz argues that a triable issue of fact exists because he received another validation review in 2005 at which a different OCS special agent determined that one or more of the five items of evidence did not meet the validation requirements.[1] The problem with his argument about later validation proceedings is that the validation criteria changed: Harrison made his determination based on the criteria in place in 2000, not those criteria that were

10

implemented pursuant to the 2004 Castillo settlement agreement. Harrison has no liability for not implementing regulations not then in place when he acted in 2000.

B.     Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In determining whether the defendant is entitled to qualified immunity, the usual first step is to answer this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 194 (2001). If no constitutional right was violated if the facts were as alleged, the inquiry ends and the defendants prevail. As discussed above, the evidence in the record does not raise a triable issue of fact that defendant violated Ruiz's due process rights. The inquiry thus ends and defendant prevails on his qualified immunity defense.

The court does not need to determine whether the law was clearly established, but notes that plaintiff would have problems in two respects on this front. First, although this court has determined that the evidence must have indicia of reliability, most of the cases on the reliability of evidence are in the context of reviewing disciplinary decisions and not administrative placement decisions. Second, plaintiff relies heavily on the gang validation procedures that have been implemented since the Castillo settlement, but those procedures do not apply to a validation decision done in 2000, four years before the Castillo settlement was reached. The defendant has no liability – let alone a clearly established duty – based on regulations that did not even exist when he made his decision.

11

**CONCLUSION**

Defendant's motion for summary judgment is GRANTED. (Docket # 80.) In light of the granting of defendant's motion for summary judgment, Ruiz's motion for summary judgment is denied. He cannot prevail when defendant is entitled to judgment in his favor. Plaintiff's cross-motion for summary judgment is DENIED. (Docket # 96.)

The clerk will enter judgment and close the file.

IT IS SO ORDERED.

Dated: November 18, 2010

_____
Marilyn Hall Patel
United States District Judge

**NOTE**

1. Ruiz had filed a state habeas action in which he alleged most of the same claims he alleged here. The state habeas proceedings are described in the Order Granting In Part Motion For Summary Judgment, at 4-6 (docket # 61). As a result of his state habeas petition, another validation hearing was held in 2005. Ruiz was validated again.

In the 2005 validation proceedings, prison officials reviewed six items, and found that five of them met the validation requirement. The five that met the validation requirement were the May 22, 1995 confidential memorandum; the April 11, 1995 confidential memorandum supported by the September 8, 1998 confidential memorandum; plus the new materials of a CDC-115 dated October 7, 2002 supported by a CDC-128b dated October 7, 2002. See Ruiz Decl., Ex. D (docket # 97). At the 2005 validation, prison officials determined that one CDC-128b dated November 13, 2000 regarding association did not meet the validation requirement. Id.